CENTRAL R. & BANKING CO. OF GEORGIA v. FARMERS' LOAN & TRUST CO.

FARMERS' LOAN & TRUST CO. v. CENTRAL R. & BANKING CO. OF GEORGIA et al.

(Circuit Court, S. D. Georgia, E. D.  March 29, 1901.)

**1. EQUITY—PROCEDURE—INTERVENTION UNDER GENERAL ORDER OF COURT.**

Where the court, in litigation involving the distribution of the proceeds of the property of an insolvent railroad company sold under its decrees, made an order requiring all creditors of the company to appear before a master and prove their claims, it cannot be objected that a creditor, asserting a right to preferential payment over other claims from funds in the hands of the court, proceeds by intervention under such order, rather than by an original bill.

**2. NEGOTIABLE BONDS—DEFENSES—RIGHTS OF PURCHASER FROM BONA FIDE HOLDER.**

A purchaser of outstanding negotiable bonds, from one who was a bona fide holder for value before maturity without notice of an infirmity therein, takes all the rights of the seller, although the second purchaser may have had notice of such infirmity when he bought; and it is immaterial that he purchased after maturity.

**3. SAME—PURCHASE AFTER DEFAULT IN PAYMENT OF INTEREST.**

Negotiable bonds are not dishonored, so as to affect the equities of a purchaser, because at the time of his purchase he had knowledge that there had been default in the payment of interest thereon.

**4. RAILROAD BONDS — ENFORCEMENT AGAINST SINKING FUND IN HANDS OF TRUSTEE—DEFENSES.**

The question whether or not a guaranty of the bonds of one railroad company by another was ultra vires is immaterial, in a proceeding by a holder to enforce payment of such bonds from a sinking fund which the company issuing them had paid into the hands of the guarantor as trustee for their redemption at maturity; nor is it any defense to such proceeding that the guarantor was without legal power to undertake the duties of trustee.

**5. RAILROAD—DISTRIBUTION OF ASSETS IN INSOLVENCY—TRUST FUND.**

A railroad company guarantied the second mortgage bonds of another company, which it controlled, and required the latter to deposit with it as trustee a certain sum each year to create a sinking fund for the payment of the bonds at maturity. Both companies became insolvent, and their property was sold under decrees of foreclosure. A certain part of the guarantor's property, which was not covered by mortgage, was sold separately, and the proceeds were set aside by the court as a fund for unsecured creditors, who were directed to prove their claims before the master. *Held*, that holders of unpaid guarantied bonds were entitled in equity to have so much of such proceeds as equaled the accumulated sinking fund treated as a trust fund and applied to the payment of their bonds, as against the holders of deficiency judgments taken in the foreclosure suits against the guarantor.

In Equity.  Consolidated causes.  On intervention of Robert S. Adams and the Charleston & Western Carolina Railway Company. Exceptions to master's report.

Augustine T. Smythe, A. M. Lee, and Anton P. Wright, for interveners.

Henry C. Cunningham and Alexander R. Lawton, for Central of Georgia Ry. Co.

¶ 2. See Bonds, vol. 8, Cent. Dig. § 111.

SPEER, District Judge.  Robert S. Adams and the Charleston & Western Carolina Railway Company have brought interventions in the consolidated causes above mentioned for the following purpose:

Robert S. Adams seeks to obtain payment of 2 second mortgage bonds issued by the Port Royal & Augusta Railway Company, numbered 78 and 80, each for the sum of $500, dated the 1st day of May, 1882.  The Charleston & Western Carolina Railway Company seeks to obtain payment of the amount due on 79 similar bonds.

It appears from the record that the second mortgage bonds of the Port Royal & Augusta Railway Company were issued on the 1st day of May, 1882.  They amount in all to $150,000.  At that time the Port Royal & Augusta was under the control of the Central Railroad & Banking Company of Georgia, which directed the operation of its physical properties and all of its financial undertakings.  The Port Royal & Augusta was embarrassed and had but little credit, and in order to float these bonds the Central Railroad & Banking Company of Georgia guarantied their payment.  The terms of the guaranty were as follows:

"For value received the Central Railroad & Banking Company of Georgia does hereby covenant and agree with the holder of the bond for the time being that the said Port Royal & Augusta Railway Company will pay the principal of said bond at maturity and the interest coupons attached thereto as they severally become due, according to the tenor thereof, and in case of default by said Port Royal & Augusta Railway in payment of principal and interest the Central Railroad & Banking Company of Georgia will pay the same.  In witness whereof the Central Railroad & Banking Company of Georgia has caused its corporate seal to be hereto attached and its guaranty to be signed by its president and countersigned by its cashier."

This guaranty is signed by William M. Wadley, president, under the seal of the indorsing corporation.  Having been given a marketable value by this guaranty, these bonds were sold, and purchased by a number of persons, who paid value therefor and bought in good faith, without knowledge or suspicion of any want of validity in the guaranty, if, indeed, it is invalid.  Among these were the intervener Robert S. Adams, who bought the two bonds he has proven.  Other purchasers were Simon Borg & Co., Francis R. Appleton, Abram S. Hewitt, executor, and Robert M. Ogden.  It cannot be fairly contended, and is, indeed, undisputed, that these were innocent purchasers in good faith in open market and for a fair consideration.  It further appears that Thomas & Ryan, a partnership dealing largely in railroad securities, bought all of these bonds held by the purchasers mentioned, save those held by the intervener Robert S. Adams.  This appears from a schedule of the bonds submitted in evidence with the distinguishing numerals of each attached.  These bonds thus purchased by Thomas & Ryan were by them assigned to the Charleston & Western Carolina Railway Company, the intervening corporation.  The Port Royal & Augusta Railway Company, the principal obligor of these bonds, has been long insolvent and has been sold under mortgage foreclosure.  The same fate has visited the Central Railroad & Banking Company of Georgia.  The properties of these corporations, by judicial orders, decrees, and sales, have been transferred to other corporations.  The former properties of the Central Railroad & Banking Company of

Georgia are now held and operated by the Central of Georgia Railway Company. The properties of the Port Royal & Augusta Railway Company were held and operated for a time by the intervening corporation, the Charleston & Western Carolina Railway Company, which has in turn passed under the control of the system known as the "Atlantic Coast Line." These results were accomplished in the main through the process known as "reorganization."

Enormous judgments, aggregating many millions of dollars of indebtedness of various descriptions, were taken against the Central Railroad & Banking Company of Georgia. Many of these judgments long antedate the decree of the circuit court for the district of South Carolina which ascertained the amount due on these bonds by the Port Royal & Augusta Railway Company, as principal, and the Central Railroad & Banking Company of Georgia, as guarantor, and the subsequent finding of the standing master. It is obviously true that if the liens of such judgments, aggregating in the neighborhood of $17,000,000, are to be treated as superior to the lien of the interveners, their demand for payment of their bonds must be denied. It is, however, true that, pending litigation, the court, the circuit judge, the Honorable Don A. Pardee, presiding, attempted to make provision for the payment of debts due by the Central Railroad & Banking Company of Georgia to creditors whose demands had not been included in the large judgments above mentioned, which were taken practically by consent in the process of reorganization. With this purpose, about the 19th of October, 1898, certain assets belonging to the said Central Railroad & Banking Company of Georgia, which were not included or covered by the terms of any mortgage on the property of said company, were ordered to be sold by a special master. The order provided that all claims of every nature whatsoever against the Central Railroad & Banking Company of Georgia or the receivers thereof were to be referred to Geo. W. Owens, standing master of this court, who was directed as special master to publish in the city of Savannah a notice calling upon all creditors to prove their claims. The property which had escaped the liens of the gigantic mortgages, which by creation or indorsement had been placed in rapid succession on the property of this ill-fated corporation, and which quite inaccurately has been termed the "overflow property," were sold for the sum of $266,000 by the special master designated for that purpose. This sum resulting from this sale, pursuant to the order of Judge Pardee, was intrusted to the custody of the Central of Georgia Railway Company. It was, however, distinctly set apart by the court to be divided among the creditors of the Central Railroad & Banking Company of Georgia whom the master should find were duly entitled thereto. The interveners now before the court have filed their intervention, setting out the facts relative to their ownership of the bonds of the Port Royal & Augusta Railway Company as above stated, and asking that their petition be referred to the special master whose duty it was to inquire into such outstanding claims, that he might proceed, conformably to the order of the court above set forth, to ascertain and make effective their demands against the fund thus set apart by the court. Becoming apprehensive, however, that the master would subject the said sum of

$266,000 to the large judgments, obtained in the process of reorganization, particularly to the judgment of $7,250 for a deficiency on certain bonds of the Central Railroad & Banking Company of Georgia, known as the "consolidated mortgage bonds," which bonds had been issued to secure a floating indebtedness of about $4,000,000, interveners applied to the court upon a petition in the main cause and obtained an order directing the master to withhold further action in hearing and reporting on the matters involved until a hearing by the court could be had.    This order was of force when counsel for the interveners and for the Central of Georgia Railway Company entered into the stipulation following:

"Petition of Robert S. Adams and C. & W. C. Railway Company.

"It is stipulated between counsel that in the references to be held before Geo. W. Owens, as special master, under order of this court bearing date the 19th day of October, 1898, Robert S. Adams and the Charleston & Western Carolina Railway Company, creditors of the Central Railroad & Banking Company of Georgia, by virtue of its indorsement and guaranty upon certain second mortgage bonds of the Port Royal & Augusta Railway Company, shall be at liberty to contest the claim of the Central of Georgia Railway Company to any right to share in any of the proceeds of the overflow assets by reason of the claim of the Oglethorpe Savings & Trust Co., trustee, against the Central Railroad & Banking Co. of Georgia, in the sum of $251,981.30, and also by reason of the claim of the Central Trust Company of New York against the Central Railroad for the amount of $7,250,000, with interest, on the consolidated mortgage bonds of the said Central Railroad & Banking Co. of Georgia, irrespective of the fact that an order was taken in the first-mentioned claim, to wit, the claim of the Oglethorpe Savings & Trust Co., trustee, on the 13th of March, 1899, and in the second-mentioned claim of the Central Trust Company by virtue of an order dated the 10th day of May, 1898, by which orders a deficiency was declared to exist in favor of the said trustees on the said mortgage bonds, and that no claim will be interposed that the said parties are precluded from making any and all such objections as they may see proper against the said claims because of the taking of the said orders; and in view of this stipulation no further proceedings will be had under the petition of Robert S. Adams and the Charleston & Western Carolina Ry. Co. filed herein, and that the restraining order granted by Judge Speer on that petition be rescinded; and that said master, Geo. W. Owens, Esq., shall proceed and make his report to the court with all convenient speed as to the distribution of the funds arising from the sale of the property and assets of the Central Railroad & Banking Company of Georgia now for distribution.

"Smythe, Lee & Frost, Anton P. Wright, for Adams and C. & W. C. R. R.

"Lawton & Cunningham, Attys. for Central of Ga. Ry. Co."

This stipulation, it will be observed, relates distinctly to the interventions now before the court, and, in consideration of the vacation by consent of the restraining order to the master above referred to, not only concedes to counsel for interveners the liberty to contest the claim of the Central of Georgia Railway Company to any right to share in any of the proceeds of the "overflow assets" by reason of the several large judgments above referred to, but also agrees "that the master, Geo. W. Owens, Esq., shall proceed to make his report with all convenient speed as to the distribution of the fund arising from the sale of the property and assets of the Central Railroad & Banking Company of Georgia now for distribution."    Pursuant to the original order of his honor, Judge Pardee, and to this stipulation of counsel, ample and, indeed, copious answers were filed,

and the master has considered the evidence, heard the arguments of counsel for both parties, and made his report. In view of the tremendous magnitude of the record, the report of the master is necessarily voluminous; but it will suffice to say that he finds the Central of Georgia Railway Company liable for the principal and interest due on the bonds before the court upon two grounds, namely: That they are entitled to payment from the fund resulting from the sale of the unpledged property, called the "overflow assets," and, again, because it appears from the record that when the Central Railroad & Banking Company of Georgia affixed its guaranty to the second mortgage bonds of the Port Royal & Augusta Railway, a provision was made for a sinking fund to meet those bonds, of which the president of the Central was made the trustee, and as such trustee he actually received in cash from the Port Royal & Augusta Railway Company a sum which, principal and interest, now amounts to $105,000, upon which sum the interveners hold in their proven bonds a lien possessing the highest equity. To the report of the master the Central of Georgia Railway Company has filed numerous exceptions. It is found convenient to consider these in the order in which they were discussed in the brief of counsel for interveners.

In this order, first, we will consider the contention of counsel for the Central of Georgia Railway Company that the interventions cannot be maintained, but that the interveners should be given to an original bill in equity. Upon this exception it will suffice to say that the interveners are here by the invitation of the court, as expressed by the order of the 19th of October, 1898. In this order the honorable circuit judge has utilized the procedure heretofore afforded by standing order for the expeditious and inexpensive determination throughout the entire litigation of the claims of the great mass of the general creditors. It has afforded the respondent full opportunity to be heard, of which it has availed by extended answers and voluminous exceptions. But, if all of this were not true, the respondent must be regarded as estopped by that provision of the stipulation above set forth which agrees "that the master, Geo. W. Owens, shall proceed to make his report to the court with all convenient speed as to the distribution of the fund arising from the sale of the property and assets of the Central Railroad & Banking Company of Georgia now for distribution." It is wholly inconsistent for the respondent to agree that the master shall report as to the distribution of this fund to creditors, and deny to such creditors the right to present their claims to the master.

Exceptions from 28 to 32, inclusive, relate to the pleadings in the consolidated causes, and are apparently made for the purpose of attacking the decision of the circuit court of appeals in the case of Railway Co. v. Paul, 35 C. C. A. 639, 93 Fed. 878. These exceptions, therefore, present matters not appropriate for the consideration of the master, and which are also without the pale of judicial attention here. The conclusion of the circuit court of appeals in that case was affirmative of the action of this court. Had it been otherwise, it would still afford a rule for our guidance.

The exception to the finding of the master that the interveners

Robert S. Adams and the Charleston & Western Carolina Railway passed the equities of bona fide holders of the bonds proven in this proceeding is also without foundation. In the first place, under the circumstances, there is a prima facie presumption of good faith in favor of the holders, which respondent must overcome. Town of Pana v. Bowler, 107 U. S. 541, 542, 2 Sup. Ct. 704, 27 L. Ed. 424. Not only is there no attempt to do this, but it abundantly appears from the record that the holders of these bonds, Abram S. Hewitt, Simon Borg, and others, who sold them to Thomas & Ryan, were innocent purchasers bona fide and for value. The title of some of these purchasers dated from the original issue, and the title of all long antedated any of the litigation in these causes. If it were conceded that Thomas & Ryan had notice of the alleged infirmities in these securities, which the respondent insists has vitiated them, nevertheless, since they bought from innocent purchasers, the bonds in their hands are attended by all the equities they ever possessed. The rule is announced in Cromwell v. Sac Co., 96 U. S. 59, 24 L. Ed. 681:

"Whenever a negotiable paper has passed into the hands of a party unaffected by previous infirmities, its character as available security is established, and its holder can transfer it to others with the like immunity. His own title and right will be impaired if any restriction were placed upon his power of disposition."

The court continues:

"The plaintiff, therefore, holds the bonds and the subsequent coupons as his vendor held them, freed from all infirmity attending the original issue."

In Commissioners v. Clark, 94 U. S. 286, 24 L. Ed. 59, the rule is otherwise expressed as follows:

"Where the first indorsee purchases an instrument before due, and pays value, without notice of any prior equities, the second indorsee, holding under the first, takes a good title, even though he had notice of such prior equities."

This rule is expressed in Story, Eq. Jur. § 409, as follows:

"A purchaser with notice may protect himself by purchasing the title of another bona fide purchaser for a valuable consideration without notice; for, otherwise, such bona fide purchaser would not enjoy the full benefit of his own unexceptionable title. Indeed, he would be deprived of the marketable value of such title, since it would be necessary to have public notoriety given to the existence of the prior incumbrance, and no buyer could be found, or none except at a depreciation equal to the value of the incumbrance. For the same reason, if a person who had notice sells to another who had no notice and is a bona fide purchaser for a valuable consideration, the holder may protect his title, although it was affected with an equity arising from notice in the hands of the person from whom he derived it; for, otherwise, no man would be safe in any purchase, but would be liable to have his own title defeated by secret equities of which he could have no possible means of making discovery."

The rule and its reason has been stated as follows:

"A purchaser without notice from one who has fraudulently purchased is not affected by the fraud; and it is also a well-settled rule of equity that a man who is a purchaser with notice himself from a person who bought without notice may protect himself under the first purchaser. The reason is to prevent a stagnation of property, and because the first purchaser, being entitled to hold and enjoy, must be equally entitled to sell." Will. Eq. Jur. p. 608.

116 F.—45

If, then, it be conceded that the interest of Thomas & Ryan, who acted for the Charleston & Western Carolina Railway in buying these bonds, was precluded by some actual notice of some invalidity, yet they can call to their aid the fact that their predecessors in ownership, who purchased without notice of any defense, and with propriety, contend that to the rights of those predecessors they have succeeded. Commissioners v. Bolles, 94 U. S. 109, 24 L. Ed. 46. But we have not been able to discover in this record any evidence of fraud on the part of Thomas & Ryan which, if they were the present holders, would deny them payment for these bonds. Nor, if, as contended, the bonds were purchased after maturity, does this avail the respondents. A bond, if valid at all, is as good after as before maturity, and it is valid unless there is some defense to it. Certainly, the principal obligor, the Port Royal & Augusta Railway Company, made no defense, and by the judgment of a court having jurisdiction the bonds have been pronounced valid. It is true that the Central Railroad & Banking Company of Georgia insists that its guaranty of these bonds was ultra vires of its charter. But this defense, if good at all, is as good against a purchaser before maturity of the bond as afterwards. It appears, however, that the purchase of Thomas & Ryan was not made after maturity. Thomas & Ryan purchased these bonds, paying face value and interest therefor, in March, 1896. The bonds were transferred to the Charleston & Western Carolina Railway on the 16th of September, 1896. The bonds matured the 1st of July, 1898. It is true that there has been a default in interest on these bonds, and thus they were said to be dishonored. But it is said in Foley v. Smith, by the supreme court of the United States (6 Wall. 492, 18 L. Ed. 931):

"The rule of law that he who takes a note overdue and dishonored takes it incumbered with all equities between the parties to it is the law of Louisiana, as well as of those states which have adopted the common law."

As we understand the rule, there is no dishonor which affects the equities of the purchaser of negotiable instruments, save the failure to pay at maturity.

We refrain from discussing the alleged fraud in the reorganization of the Central Railroad & Banking Company of Georgia, referred to by counsel. Counsel on either side had much to say about this supposititious fraud, and yet on both sides they protested that there was no fraud. The discussion seems superfluous, and, in view of the mutual protestations, not a little mystifying and vague. Certainly nothing was said on this topic to affect the right of the interveners to have their bonds paid from the unpledged property set apart by the order of the circuit court for creditors of the class to which they belong.

Nor is it deemed important to consider whether the indorsement of the second mortgage bonds of the Port Royal & Augusta Railway by the Central Railroad & Banking Company of Georgia was ultra vires. Other similar indorsements by that company of the bonds of other railroads, to wit, the Macon & Northern, Savannah & Western, Savannah & Atlantic, and Chattanooga, Rome & Colum-

bus, have been held, not ultra vires, but valid. This was done by this court in this litigation, Mr. Justice Jackson rendering the decision. The master in this case held that the guaranty was not affected by the doctrine of ultra vires, and there was no specific exception to his finding on that point. Whether the indorsement of these bonds was ultra vires or not, it was in fact made; and, moreover, the Central Railroad & Banking Company of Georgia had more than once insisted, through its proper officers, by solemn pleadings in this litigation, that it was entirely valid and constituted a part of their indebtedness. It is, moreover, indisputable from the record that the Central received large advantages by its control of the Port Royal & Augusta Railway Company, of which this indorsement was an incident. The Central owned a large and controlling interest in the stocks and bonds of that road. It was operated by the Central's traffic manager, and was completely dominated by the Central directorate. This relationship has been judicially determined in Phinizy v. Railroad Co. (C. C.) 62 Fed. 771. These bonds were made marketable by that indorsement, and to secure itself from loss on the guaranty the Central Railroad & Banking Company provided a sinking fund into which the Port Royal paid large sums to retire these bonds. This sum, with its accrued interest, whether the guaranty was ultra vires or not, we are satisfied, ought clearly to be appropriated to the satisfaction of the interveners' bonds, with interest. The clause of the second mortgage providing for this sinking fund stipulated that the Port Royal & Augusta Railway should pay over annually the sum of $6,000 for the redemption of the aforementioned bonds at maturity. The Central, no doubt, in consideration of the actual benefits it received because of its guaranty, accepted this provision, and became a trustee for this sinking fund, and agreed that it should bear interest at 5 per cent. per annum, to be compounded annually until maturity, and the president of the Central was made trustee. These payments to the sinking fund, made for a number of years by the Port Royal & Augusta Railway, now, as we have stated, amount, with interest, to $105,000.

It is said that the Central Railroad & Banking Company of Georgia was without power to undertake to act as trustee for this sinking fund. It is clear enough that it took the money of the Port Royal & Augusta Railway, and that it has that money, and if, of its own volition, it could not become an express trustee for these bondholders, a court of equity will declare an implied trust in their behalf, and require the Central to account to them for the values which are equitably subject to the payment of these bonds. We regard this view as conclusive of the controversy before the court. It makes it unnecessary for us to consider the claim by the Central of Georgia Railway Company that it has the right to subject to their judgments for about $17,000,000 the fund set apart by his honor, Judge Pardee, for the unsecured creditors. This would not only defeat the claims of the interveners, but would render inutile and idle the direction to creditors to prove before the standing master their right to participate in this fund. It is evident that his honor, Judge Pardee, never

contemplated such a demand on the part of the reorganized company, to which these $17,000,000 of judgments have been transferred; otherwise, the order would not have been passed. If, however, we are in error in this, certainly it seems true that the petition of the holders of these bonds, that the sums received by the Central Railroad & Banking Company of Georgia to constitute a sinking fund for their protection should be treated as a trust in their behalf, presents a demand which a court of equity will find it impossible to resist. Its values cannot be subjected to judgments against the Central Railroad & Banking Company of Georgia, because they do not constitute an asset of that company. They belong to the second mortgage bondholders of the Port Royal & Augusta Railway. Under the orders of the court the Central of Georgia Railway Company has succeeded to the liability of the Central Railroad & Banking Company of Georgia as to this particular claim.

It is said that the Central Railroad & Banking Company of Georgia also owns a large number of bonds of the Port Royal & Augusta Railway Company, and that it is entitled to a pro rata share in the values of the sinking fund. This contention must be denied. In the first place, these alleged bonds of the Central have not been proven before the master, and we have no evidence of their existence. Secondly, if, as contended, these bonds represent an investment of a portion of the sinking fund, the title would not be in the Central Railroad & Banking Company of Georgia, but in the Central Railroad & Banking Company of Georgia as trustee of the sinking fund, and the value of these bonds should in that event be added by the Central to the amount of the sinking fund.

Reviewing the entire case, and without discussing the reasoning of the master, or expressing any opinion as to his views on any topic not necessarily involved in this finding, we are satisfied that his conclusion that Robert S. Adams is entitled to judgment against the Central of Georgia Railway Company and the Central Railroad & Banking Company of Georgia for the sum of $1,000, with interest on his bonds at 6 per cent. from July 1, 1892, and that the Charleston & Western Carolina Railway Company is entitled to a judgment against the Central Railroad & Banking Company of Georgia and the Central of Georgia Railway Company for the sum of $39,500, with interest on its bonds at 6 per cent. from July 1, 1892, should be affirmed; and, without adopting the phraseology of the master, we further find that these sums should be paid from the sum of $266,000, the proceeds of the sale of the unpledged properties of the Central, known as the "overflow fund" hereinbefore defined, and that these sums, principal and interest, shall be paid without reference to any other claim, decree, or judgment against the Central Railroad & Banking Company of Georgia owned or controlled by either of said respondent companies or by any person or corporation for them.

A decree will be entered in accordance with this decision.

NOTE. The decision in this case was affirmed by the circuit court of appeals of the Fifth circuit. 114 Fed. 263.